**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **RABIAHTU PETERKIN** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO.  21-490** |
| | : | |
| **PROSPECT AIRPORT SERVICES,** | : | |
| **INC.,** *et al.* | : | |

## <u>MEMORANDUM</u>

**KEARNEY, J.**                                                                                    **June 11, 2021**

We unfortunately expect persons hired to assist the public in busy airport terminals may face uncivil words and comments from anxious travelers or stressed colleagues. Busy terminals are often not a calm oasis.  We also understand an employee's hurt feelings when her employer transfers her around the airport after she reports being insulted by comments about her appearance. These concerns may become more complicated when the employee wears a full face niqāb and full body abaya consistent with her Muslim faith. We do not approve of intemperate or ignorant words and acts shaming a person's religious beliefs. But the law is not a code of civility.

We today address an employee suing not only her employer for altering her tasks but also the airlines who contract for airport gates and the city owning the airport. She must do more than assert intemperate or uncivil comments or thoughtless acts to proceed into discovery. She must plead facts allowing us to plausibly infer adverse employment actions caused by discrimination or retaliation which may arise from her race or religious beliefs. We today scrutinize an unwieldly litany of comments and acts over several months in 2019 by several different persons.  She pleads the lack of civility affected her mental well-being. Our scrutiny of her amended Complaint confirms the employee cannot proceed on her presently pleaded claims. She did not exhaust her race-based Title VII claim. She fails to plead religious-based discrimination under Title VII, race-

based discrimination under section 1981, hostile work environment claims based on race and religion, an employment relationship with the City of Philadelphia, abandoned her sex-based discrimination, retaliation, and aiding and abetting claims under state law, and is otherwise barred from bringing claims under Philadelphia ordinances. We grant her leave to timely file a second amended Complaint consistent with this Memorandum if she can do so in good faith. We urge her counsel to avoid the litany of personal complaints and focus on possible exhausted legal claims under Federal Rules 8 and 11.

## I.   Alleged Facts

Prospect Airport Services, Inc. hired Rabiahtu Peterkin in January 2019 to work at the Philadelphia International Airport as a personal service attendant responsible for, among other things, pushing wheelchairs for passengers needing assistance, greeting and assisting hearing and visually impaired passengers, and answering passengers' questions regarding the Airport.[1] Prospect Services hired her, paid her wages, and had the ability to fire her. Its employees, Dontae Robinson, Emmanuel Davila, Renee Ferro, and Jose Robles, had supervisory authority over her.[2]

Ms. Peterkin alleges Prospect Services had joint control over her daily employment activities with Piedmont Airlines, American Airlines Group, Inc., and the City of Philadelphia.[3] Ms. Peterkin alleges managers and supervisors of Piedmont Airlines, American Airlines, and the City controlled the manner and means of her work, including her daily work assignments.[4] She also alleges Piedmont Airlines and American Airlines could and did at some unspecified time and in some unspecified manner, discipline her.[5]

*Ms. Peterkin's request for religious accommodation.*

Ms. Peterkin is an Afro-Latina Muslim American woman who wears a full face niqāb and full body abaya consistent with her religious practices.[6] When Ms. Peterkin began working for

Prospect Services, she requested a religious accommodation to allow her to wear her niqāb and abaya while at work.[7] Prospect Services approved her request. Ms. Peterkin alleges "Defendants" required her to complete a background and safety questionnaire administered by the City to receive clearance for work at the City owned and operated Airport.[8] Once cleared, Prospect Services assigned Ms. Peterkin to work at gates operated by Piedmont Airlines and American Airlines.[9] Ms. Peterkin's job duties included waiting at arrival gates for passengers who needed wheelchair assistance.[10] Ms. Peterkin preferred the wheelchair assignment because she earned tips from passengers she assisted. Ms. Peterkin alleges the City owns the wheelchairs.

### February or March 2019 incident with a passenger.

While waiting at a gate for arriving passengers in February or March 2019, a male African American passenger appearing to need assistance approached Ms. Peterkin. When Ms. Peterkin offered assistance, the passenger replied: "You can't help me you Muslim terrorist b****! You might have a bomb under that s***," referring to her religious garments.[11] In an effort to de-escalate the situation, Ms. Peterkin asked one co-worker to attend to the passenger, asked another co-worker to find a manager, and left the area. Ms. Peterkin alleges no manager from Prospect Services responded, but a Piedmont Airlines gate manager assured her not to worry about the passenger's comment which she interpreted as Piedmont protecting her from the customer's complaint.

Ms. Peterkin reported the passenger's comment to Prospect Services's terminal supervisor, Dontae Robinson.[12] Piedmont Airlines, American Airlines, and Supervisor Robinson did not prepare an incident report, ask Ms. Peterkin to prepare an incident report, investigate the incident, or speak with the passenger who made the comment to Ms. Peterkin.[13]

At some unplead time after the incident with the passenger, unidentified employees of Piedmont Airlines met with Ms. Peterkin to remind her of the importance of maintaining composure and professionalism during stressful situations.[14] Ms. Peterkin alleges Piedmont Airlines did not counsel other Piedmont Airlines employees subject to passenger bullying about the importance of maintaining composure.[15] Ms. Peterkin does not identify the other Piedmont employees or allege how other Piedmont employees outside her protected class were treated more favorably.

### *May 7, 2019 incident with Piedmont Airlines and Prospect Services managers.*

Ms. Peterkin reported to work during the Muslim holy month of Ramadan including on May 7, 2019. Prospect Services manager Defendant Davila and Piedmont Airlines manager Claribel Santiago asked Ms. Peterkin to go the Prospect Services's office to complete another religious request accommodation because Prospect Services's Human Resources department lost her original request.[16] After completing a second religious request accommodation, Manager Davila told Ms. Peterkin she must carry a copy of the religious accommodation paperwork with her at all times.[17] Ms. Peterkin alleges non-Muslim employees requesting religious accommodation are not required to complete a second form if the request remained unchanged.[18]

Prospect Services's Director of Human Resources Renee Ferro met with Ms. Peterkin on May 7, 2019.  Human Resources Director Ferro told Ms. Peterkin neither Piedmont Airlines nor American Airlines wanted her to assist their passengers because her religious garments covered her face.[19] Ms. Peterkin alleges Human Resources Director Ferro threatened her by saying, "If you don't want to uncover, you just won't be able to push wheelchairs."[20] Ms. Peterkin alleges unidentified persons prohibited her from pushing Piedmont and American Airlines passengers in wheelchairs for a two-week period because of her religious garb, resulting in lost tips.[21]

### *Ms. Peterkin files a union grievance on May 13, 2019.*

Ms. Peterkin filed a union grievance after meeting with Human Resources Director Ferro. On May 22, 2019, Ms. Peterkin and her union representative met with Prospect Services's General Manager Robles and Human Resources Director Ferro. General Manager Robles and Human Resources Director Ferro told Ms. Peterkin she could resume pushing wheelchairs. She alleges General Manager Robles and Human Resources Director Ferro denied telling her she could not push wheelchairs while wearing religious garb, and threatened her if she "countered their word and authority."[22] After General Manager Robles and Human Resources Director Ferro denied making the alleged statements, Ms. Peterkin requested "the situation" be recorded.[23] General Manager Robles and Human Resources Director Ferro objected to being recorded, but accused Ms. Peterkin of recording the meeting which she denies.[24] Ms. Peterkin alleges these supervisors did not treat non-Muslim employees in the same manner.[25] It is unclear what treatment Ms. Peterkin refers to.

### *July 5 and 6, 2019 incidents with an American Airlines employee.*

Ms. Peterkin reported to her assigned gate for work on July 5, 2019. American Airlines employee Martin Howlett asked her to identify herself, asked why she stood in the gate area, and demanded to see her identification badge. [26] Ms. Peterkin claims she prominently displayed her badge and Mr. Howlett did not ask for the badge of her male co-worker, who did not display his badge. Ms. Peterkin showed Mr. Howlett her badge and told him she is a Prospect Services's employee. Mr. Howlett responded, "I don't know that's you on that badge. I need to see your face right now," a demand he made in the presence of passengers boarding at a nearby gate making her feel uncomfortable, humiliated, and embarrassed.[27]

Ms. Peterkin's religion precludes her from showing her face in public and to a man. If asked to be identified, Ms. Peterkin is permitted to show her face to a female employee or manager in a secluded area. To accede to Mr. Howlett's demands, Ms. Peterkin lifted her veil, drawing the attention of other Piedmont and American Airlines and Prospect employees, as well as passengers, to "see if they could see [her] face."[28] Ms. Peterkin claims Mr. Howlett did not follow protocol allowing a female manager to verify her identity. Ms. Peterkin alleges his conduct caused her emotional distress and violated her religious customs. Ms. Peterkin requested Mr. Howlett's name, but he refused to give it to her and covered his own badge so she could not see his name.

Ms. Peterkin then sought the assistance of an unidentified gate agent for American Airlines and asked him to call a manager. American Airlines manager Defendant Cortez and another manager responded to the call and told Ms. Peterkin they would "handle it."[29] Ms. Peterkin left work for the balance of July 5 and now claims emotional distress from the incident with Mr. Howlett.

Ms. Peterkin returned to work the next day. She again encountered Mr. Howlett who demanded to see her badge despite her prominently displaying it and their altercation the day before. Ms. Peterkin refused to show her badge. Mr. Howlett attempted to hit Ms. Peterkin and grab the badge from her body. Fearing for her safety, Ms. Peterkin asked a co-worker to call security. The co-worker returned with Prospect Services's employee Jawan Mansfield, but he did nothing to assist Ms. Peterkin.[30]

Ms. Peterkin called Prospect Services's General Manager Robles to report her altercation with Mr. Howlett. General Manager Robles responded to Ms. Peterkin's concern with the suggestion she should "represent Prospect in a professional manner" and offered no other instruction to her or concern for her safety.[31] Mr. Mansfield took Ms. Peterkin to work at another

gate for the rest of her shift. She alleges neither Mr. Mansfield nor General Manager Robles prepared an incident report, asked her to prepare an incident report, or investigated the situation with Mr. Howlett.

At some point during her July 6, 2019 shift, Ms. Peterkin asked to speak to "management" at American Airlines. American Airlines Manager Cortez responded, "Again? Are you serious? We haven't even begun to investigate last night's incident," referring to the July 5 incident with Mr. Howlett.[32] Ms. Peterkin told Manager Cortez she could not continue to be subjected to Mr. Howlett's behavior and Manager Cortez told her to clock out at another gate to avoid Mr. Howlett. Ms. Peterkin alleges Manager Cortez did not reprimand Mr. Howlett or speak with him about his behavior.[33]

Ms. Peterkin objects to having to clock out at another gate because it is not centrally located and inconvenient for her which she considers a "negative consequence," while Mr. Howlett suffered no consequences. She alleges her supervisors did not require other non-Muslim employees victimized by similar work-place discrimination and behavior to alter their work routines, including their clock out location.[34]

### *The September 2019 incidents with co-workers and passengers.*

Prospect Services's employee Keisha Rodgers told Ms. Peterkin on September 4, 2019 she must wear her company-provided vest.[35] Ms. Peterkin claims while she always kept a vest with her, no one instructed or required her to wear it and no one ever reprimanded her for not wearing it. Ms. Peterkin alleges the requirement she wear her vest is retaliation by "Defendants" for opposing and reporting "Defendants'" unlawful and discriminatory behavior.[36] Ms. Peterkin does not identify the discriminatory behavior she reported and to whom she reported it. Ms. Peterkin felt singled out, embarrassed, and suffered mental distress for having been made to wear the vest.

Over three weeks later, Prospect General Manager Robles told Ms. Peterkin on September 27, 2019 she would be moved to the Airport's international terminal, a location change she alleges put her in full view of all passengers and visitors in the airport. Ms. Peterkin's assignment required her to stand at a podium where she could not leave for any reason, including to use the restroom or perform her daily prayers.[37] Ms. Peterkin alleges she learned from a co-worker the "Defendants" stationed her at the international terminal to subject her to bullying by other employees and passengers for wearing religious garments.[38]

Two days later, on September 30, 2019, a white male passenger approached Ms. Peterkin and said, "I can't believe they have a f***ing terrorist working at the airport."[39] Ms. Peterkin reported the incident to Ms. Rodgers who responded, "this keeps happening to you."[40] Dissatisfied with Ms. Rodgers' response, Ms. Peterkin reported the incident to Frank Bonilla. Ms. Peterkin does not allege Mr. Bonilla's position or who employs him. Mr. Bonilla, who is not a party, told Ms. Peterkin he would write a report but he failed to do so and failed to take any remedial action.

### Ms. Peterkin files a charge with the Equal Employment Opportunity Commission and then this case.

On September 24, 2019, Ms. Peterkin filed a charge with the Equal Employment Opportunity Commission, dual filed with the Pennsylvania Human Relations Commission ("PHRC"), alleging continuing action beginning January 2019 of discrimination based on sex and religion and retaliation.[41] Ms. Peterkin's EEOC charge of discrimination checked only the boxes for sex, religion, and retaliation.[42] She did not check the boxes for race or color. Her nineteen-page 166 paragraph narrative attached to her EEOC charge form is captioned "Nature of Complaint: Religious Descrimination [sic], Race/Color Discrimination, Sex Discrimination, Hostile Work Environment, and Retaliation."[43] There is no mention of race discrimination in the charging documents.

The EEOC issued Ms. Peterkin a right-to-sue letter on September 10, 2020.[44] Ms. Peterkin contracted COVID-19 in Fall 2020 requiring hospitalization. The hospital released Ms. Peterkin on October 31, 2020 and she remains on medical leave from her work at the airport.[45]

Ms. Peterkin filed this action on February 2, 2021.[46] The PHRC issued a right-to-sue letter on February 5, 2021.[47] Ms. Peterkin brings thirteen claims[48] under federal and state statutes and the Philadelphia Fair Practices Ordinance ("PFPO") against:

1. Prospect Services, Piedmont Airlines, American Airlines, and the City for discrimination on the basis of her religion and race in violation of Title VII; [49]

2. Prospect Services, Piedmont Airlines, American Airlines, and the City for a hostile work environment in violation of Title VII;

3. Prospect Services, Piedmont Airlines, American Airlines, and the City for retaliation in violation of Title VII;

4. Prospect Services, Piedmont Airlines, American Airlines, and the individual Defendants for race-based discrimination under 42 U.S.C. § 1981;

5. Prospect Services, Piedmont Airlines, American Airlines, and the individual Defendants for race-based hostile work environment under 42 U.S.C. § 1981;

6. Prospect Services, Piedmont Airlines, American Airlines, and the individual Defendants for retaliation under 42 U.S.C. § 1981;

7. The City for employment discrimination on the basis of race in violation of the Equal Protection Clause under 42 U.S.C. § 1983;

8. Prospect Services, Piedmont Airlines, and American Airlines for discrimination on the basis of sex in violation of the PHRA; [50]

9. All Defendants for retaliation in violation of the PHRA;

10. All Defendants for aiding and abetting unlawful discriminatory practices under the PHRA;

11. All Defendants for discrimination on the basis of sex under the PFPO; [51]

12. All Defendants for retaliation under the PFPO; and

13. All individual Defendants for aiding and abetting unlawful employment practices under the PFPO.

## II.     Analysis

The City, American Airlines, and Piedmont Airlines each move to dismiss Ms. Peterkin's amended Complaint.[52]  They argue they are not joint employers with Prospect Services and cannot be held liable for the alleged discriminatory conduct. American Airlines and Piedmont Airlines argue even if Ms. Peterkin sufficiently alleges they are joint employers, she fails to state a claim for discrimination, retaliation, and hostile work environment under Title VII, section 1981, the PHRA, and the PFPO.

Prospect Services and individual defendants Davila, Ferro, Rodgers, and Robles (collectively, "Prospect Defendants") also move to dismiss.  They argue we lack subject matter jurisdiction over Ms. Peterkin's state law claims because they are preempted by the federal Aviation and Transportation Security Act. They also argue Ms. Peterkin fails to state claims under Title VII, section 1981, and state law, and the PHRA precludes Ms. Peterkin's PFPO claims.

### A.     We deny the Prospect Defendants' Motion to dismiss asserting lack of subject matter jurisdiction.

The Prospect Defendants move to dismiss arguing we lack subject matter jurisdiction. A challenge to our subject matter jurisdiction may be either a facial or factual attack. A facial attack challenges our jurisdiction on the face of the complaint without contesting its alleged facts. A complaint which, on its face, fails to present a federal question or diversity of citizenship are examples of a facial attack.[53]

A factual attack challenges jurisdiction because the facts of the case do not support jurisdiction. We may look beyond the complaint to determine if the facts support the asserted jurisdiction. For example, if a complaint adequately pleads diversity of citizenship, a defendant

may submit proof diversity is lacking.[54] If a defendant makes a factual challenge, the plaintiff has

the burden of proving jurisdiction exists and we may weigh evidence to determine our jurisdiction

over the case.[55] Unlike a facial attack, we do not consider the allegations of the complaint as true.[56]

The Prospect Defendants make a facial and factual attack to our subject matter

jurisdiction.[57] They argue the Aviation and Transportation Security Act[58] and Transportation

Security Administration ("TSA") regulations[59] preempt Ms. Peterkin's state law claims and "take

precedence" over her federal claims.

In response to the September 11, 2001 attacks on the United States, Congress enacted the

Aviation and Transportation Security Act creating the TSA.[60] The Administrator of the TSA is

empowered to prescribe regulations to protect passengers and property in air transportation.[61] The

Administrator is responsible for, *inter alia*, publishing sanctions "for use as guidelines in the

discipline of employees for infractions of airport access control requirements …"; working with

airport operators and carriers to implement and strengthen controls to eliminate airport access

control weaknesses; requiring airport operations and air carriers to train its employees on airport

security; and improving airport perimeter access security.[62]

Federal regulations require airport operators to maintain a security program over at least

one secured area to prevent and detect the unauthorized entry or presence of individuals and

vehicles into the secured area by, among other measures, establishing a personal identification

system for airport employees and a "challenge program" requiring each individual with authorized

access to secured areas and "security identification display areas" to "ascertain the authority of

any individual who is not displaying an identification medium authorizing the individual to be

present in the area."[63] Airport operators must establish a personnel identification system, including

identification conveying a full-face image, full name, employer, identification number, and the scope of the individual's access and movement privileges.[64]

The Prospect Defendants argue the Aviation and Transportation Security Act preempts Ms. Peterkin's claims because the complained-of conduct by American Airlines employee Mr. Howlett on July 5 and 6, 2019 challenged her identity and presence in a gate area as required by TSA regulations. The Prospect Defendants argue Mr. Howlett did not make remarks conveying religious animosity and simply followed federal regulation in challenging Ms. Peterkin's identification presence in the gate area. They argue Ms. Peterkin's allegations are so intertwined with Mr. Howlett's obligations under the TSA regulations, we lack authority to adjudicate her federal and state claims.

The Prospect Defendants cite several cases finding the Aviation and Transportation Security Act preempts state and federal employment statutes. For example, in *Vanderklok v. United States*, a TSA agent believed a search of a passenger's bag and an alleged bomb threat at the Philadelphia International Airport warranted calling Philadelphia Police.[65] After his arrest and later acquittal on criminal charges, the passenger filed a complaint against the United States, the TSA, the City of Philadelphia, and Philadelphia police asserting constitutional claims under 42 U.S.C. § 1983, a *Bivens*[66] claim against the TSA agent alleging First Amendment retaliation, and state law claims.[67]

Our Court of Appeals reversed the district court's denial of the TSA agent's motion for summary judgment on a First Amendment retaliation claim.[68] The court refused to imply a *Bivens* action for damages against a TSA agent because the Supreme Court has never implied a *Bivens* remedy in cases involving national security and because of its reluctance to "weigh in" on matters of national security, finding Congress is in a better position to regulate remedies in this context.[69]

12

The court relied on the language of the Aviation and Transportation Security Act limiting the scope of judicial review of the TSA's actions and exclusive jurisdiction "to affirm, amend, modify, or set aside any part" of an order issued by the Secretary of Transportation or Administrator of the TSA.[70] In the context of airport security, remedies are set by Congressional decisions, Congress decided the scope of liability of the United States and its employees, and created an administrative scheme to adjudicate complaints against the TSA.[71] Our Court of Appeals declined to craft a remedy under *Bivens* in the specific context of airport security screeners for First Amendment retaliation claims.[72] *Vanderklok* is factually distinguishable and does not help the Prospect Defendants' preemption argument. Other cases cited by the Prospect Defendants hold the Aviation and Transportation Security Act preempts employment claims brought by TSA security screeners under the Rehabilitation Act against the TSA.[73] These are inapplicable.

Ms. Peterkin responds she is not challenging the TSA's right to implement identification procedures; she instead challenges Defendant Howlett's treatment of her because of her religious garments. She points to her allegations she prominently displayed her badge while her co-worker did not display his badge, but Mr. Howlett aggressively interrogated her and not the co-worker.[74] She also alleges her request to wear her religious garments, including her face veil, had already been approved, but Mr. Howlett nevertheless demanded to see her face and badge in contravention of the approved and established protocol for verifying her identity.[75]

Neither party provides us with authority regarding the preemptive effect of the Aviation and Transportation Security Act on Title VII, section 1981, or state employment statutes. Several federal appellate courts conclude the Aviation and Transportation Security Act preempts the application of the Rehabilitation Act to TSA security screeners based on the language of the Act.[76] The Act provides: "[n]otwithstanding any other provision of law, an individual may not be

deployed as a security screener unless that individual meets" certain educational levels, aptitude, physical abilities, and the ability to read, speak, and write English.[77]

We have not located, and the parties have not provided us, with authority the Aviation and Transportation Security Act preempts anything other than Rehabilitation Act claims or in cases involving employees other than TSA security screeners. A recent decision from the United States Court of Appeals for the Ninth Circuit suggests the Aviation and Transportation Security Act does not preempt Title VII.[78] In *Galaza v. Wolf*, the court of appeals considered its appellate jurisdiction over a terminated security screener's appeal from the district court's dismissal of her Rehabilitation Act claims.[79] After the district court dismissed with prejudice the employee's Rehabilitation Act claims as preempted by the Aviation and Transportation Security Act, but ***not*** her Title VII sex discrimination, hostile work environment, and retaliation claims, the employee voluntarily dismissed her Title VII claims. The court concluded it lacked appellate jurisdiction.[80] Although decided on a different issue, the court held the Aviation and Transportation Security Act did not preempt the employee's Title VII claims. In *Teamer v. Napolitano*, the district court dismissed a security screener's claim under the Rehabilitation Act as preempted by the Aviation and Transportation Security Act and claims under Title VII and the Age Discrimination in Employment Act for failure to exhaust administrative remedies, not because of preemption.[81]

Neither Ms. Peterkin nor Mr. Howlett are TSA security screeners. This case is not about the TSA's decision to hire a security screener under the requirements of the Aviation and Transportation Act who challenges the TSA's employment decisions under the Rehabilitation Act. There is no authority on the preemptive effect of the Aviation and Transportation Act on Title VII, section 1981, or state law employment statutes other than the Rehabilitation Act. We deny the Prospect Defendants' motion to dismiss under Rule 12(b)(1).

**B.    Ms. Peterkin fails to plausibly allege the City is a joint employer with Prospect Services but sufficiently alleges American Airlines and Piedmont Airlines are joint employers with Prospect.** [82]

The City, American Airlines, and Piedmont Airlines move to dismiss Ms. Peterkin's claims for failing to plausibly allege an employment relationship. Ms. Peterkin alleges Prospect Services hired and paid her, but seeks to hold the City, American Airlines, and Piedmont Airlines liable as joint employers under Title VII, the PHRA, and the PFPO.

Two entities may be "joint employers" of one employee liable for discrimination under section 1981 and Title VII.[83] Because we interpret PHRA claims coextensively with Title VII, we apply the joint employer test to her claims under the PHRA.[84] To prevail on her claims under Title VII, section 1981, the PHRA, and the PFPO, Ms. Peterkin must plausibly allege the existence of an "employment relationship" with the City, American Airlines, and Piedmont Airlines.

Our Court of Appeals focus on "three indicia of control" to determine joint employer status: (1) the entity's "authority to hire and fire employees, promulgate work rules and assignments, and set conditions of employment including compensation, benefits, and hours"; (2) day-to-day supervision, including employee discipline; and, (3) control of employee records, including payroll, insurance, and taxes.[85] Although our Court of Appeals focuses on these three factors, we are directed to assess and weigh "all of the incidents of the relationship … with no one factor being decisive.'"[86]

### 1.    Ms. Peterkin fails to plausibly allege the City is a joint employer.

Ms. Peterkin alleges the City owns, operates, and manages the Airport; it has a "contractual relationship" with American Airlines, Piedmont Airlines, and Prospect Services; the City controlled her employment activities; City managers and supervisors exerted substantial control

over the manner and means of her work; the City conducted a background check and clearance for work at the airport; and the City owns the wheelchairs used to transport passengers at the airport.[87]

Ms. Peterkin does not allege the City hired her or paid her wages; she alleges Prospect Services hired and paid her wages.[88] This admission weighs against a finding the City is a joint employer with Prospect.

She pleads no facts to support a conclusory allegation the City controlled her employment activities and exerted substantial control over the manner and means of her work. Ms. Peterkin does not identify City managers or supervisors who allegedly exerted substantial control over the manner and means of her work. She does not allege facts as to how the City controlled her employment activities. These conclusory allegations are insufficient to state a claim under a joint employer theory of liability.

Her only allegations regarding the City is it owns and operates the Airport, conducted a background check for clearance to work at the Airport, and it owns the wheelchairs used to transport passengers. Accepting these allegations as true as we must at this stage, the City's background check for clearance to work at the airport is at best neutral. The City's ownership of the Airport and the wheelchairs—presumably the "tools" of Ms. Peterkin's work—weighs in favor of finding of joint employer. But this is the only *Darden* factor weighing in favor of joint employment.

Considering the three key factors applied by our Court of Appeals and all the *Darden* factors, Ms. Peterkin fails to plausibly allege the City and Prospect Services are joint employers. She cannot hold the City liable for the alleged Title VII, section 1981, PHRA, and PFPO claims. We dismiss Ms. Peterkin's claims against the City of Philadelphia.

2.      **Ms. Peterkin plausibly alleges American Airlines and Piedmont Airlines are joint employers with Prospect Services.**

Applying the three-factor indicia of control, there are no allegations to support the first and third factor. There are no allegations Piedmont and American Airlines paid Ms. Peterkin's salary or hired or fired her or controlled employee records such as payroll, insurance, or taxes, weighing against finding a joint employer relationship with Prospect Services. But Ms. Peterkin sufficiently alleges facts to support an inference Piedmont and American Airlines' controlled her daily employment activities.

Ms. Peterkin alleges Piedmont Airlines and American Airlines controlled her employment activities through its managers and supervisors who dictated her daily assignments such as gate location, daily tasks, and duties; disciplined her; participated in reviews of her religious accommodation requests; and responded to calls for manager's assistance.[89] Ms. Peterkin alleges unnamed Piedmont Airlines employees met with her after the February/March 2019 incident to remind her to maintain composure and professionalism during stressful situations; in May 2019, Prospect Services's Human Resources Director Ferro told her Piedmont Airlines and American Airlines did not want her assisting their passengers because of her religious garments; and after her union grievance meeting, Prospect Services's General Manager Robles told her he met with Piedmont and American Airlines, suggesting these entities had some input into the grievance meeting.[90] These factors all weigh in favor of finding joint employer status with Prospect Services based solely on the pleadings and subject to discovery.

Ms. Peterkin fails to allege facts sufficient to support the balance of the remaining *Darden* factors, weighing against joint employer status. Discovery may well bear out Piedmont Airlines and American Airlines did not exert significant control over the day-to-day supervision  of Ms. Peterkin's employment. But as currently pleaded, Ms. Peterkin's amended Complaint is sufficient

to nudge her allegations over the plausibility line. We deny Piedmont Airlines and American Airlines' motions to dismiss for failure to allege an employment relationship.

      C.     **Ms. Peterkin fails to state a claim for race, religion and sex discrimination claims under Title VII, section 1981, the PHRA, and the PFPO.**

Ms. Peterkin brings claims against Prospect Services, Piedmont Airlines, and American Airlines for religion and race-based discrimination, hostile work environment, and retaliation under Title VII; race-based discrimination, hostile work environment, and retaliation under section 1981; and discrimination on the basis of sex in violation of the PHRA and PFPO.

Title VII, the PHRA, and the PFPO prohibit discrimination by an employer on the basis of an individual's race, religion, and sex.[91] Section 1981 prohibits employment discrimination on the basis of race.[92] Claims under Title VII, section 1981, the PHRA, and the PFPO are analyzed under the same standard.[93]

Before bringing a claim for employment discrimination under Title VII, a plaintiff must administratively exhaust her claims by timely filing a charge with the EEOC and receive a right-to-sue letter.[94] This exhaustion is also a requirement before bringing a claim under the PHRA[95] and the PFPO.[96] When a plaintiff timely files a charge with either the EEOC or the Pennsylvania Human Relations Commission ("PHRC") and requests dual filing, the charge is deemed filed with both agencies under a worksharing agreement between the EEOC and PHRC.[97] "[T]he parameters of the civil action in the district court are defined by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination, including new acts which occurred during the pendency of proceedings before the [EEOC]."[98] Claims under section 1981 do not require exhaustion of administrative remedies.[99]

1.       **Ms. Peterkin failed to exhaust her Title VII race-based discrimination claim.**

The Prospect Defendants argue Ms. Peterkin failed to exhaust her race-based Title VII claims because she did not check the "race" box on her EEOC charge.[100] The Prospect Defendants argue we need not liberally construe Ms. Peterkin's EEOC charge because her counsel filed it and nevertheless failed to check the "race" box. The factual narrative attached to the EEOC charge is captioned "Religious Descrimination [sic], Race/Color Discrimination, Sex Discrimination, Hostile Work Environment, and Retaliation" but offers no facts to support allegations of race-based discrimination. The Prospect Defendants argue the race-based claims for discrimination and hostile work environment are unexhausted and should be dismissed as a matter of law.

The purpose of Title VII's exhaustion requirement is to allow the EEOC the opportunity to settle disputes through its conciliation process[101] and to put the employer on notice of the claims against it.[102] After a charge is filed, "the scope of a resulting private civil action in the district court is 'defined by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination ....'"[103]

The failure to check a box on an EEOC charge does not, categorically, preclude a plaintiff from asserting the claim but "it does prevent a plaintiff from 'greatly expand[ing] an investigation simply by alleging new and different facts.'"[104] To determine whether Ms. Peterkin administratively exhausted her race-based claims, we ask whether the race-based claims are "fairly within the scope" of the EEOC charge or investigation.[105]

Ms. Peterkin admits her EEOC charge fails to check off the race box, but argues her race-based claims are fairly encompassed within her religion and sex-based claims of discrimination and retaliation. Although counsel filed the EEOC charge, Ms. Peterkin argues it would be unduly harsh to deny her "day in court" on her race claims.

Ms. Peterkin does not point us to where—in her nineteen-page, 166 paragraph "Charge of Discrimination" narrative attached to her EEOC form—her claims of race discrimination are described so as to be "fairly within the scope" of her religion and sex-based charges. A review of the Charge of Discrimination reveals allegations of discrimination arising from Ms. Peterkin's religious garments, including the allegation Prospect Services prohibited her from pushing wheelchairs because of her religious garments. Only the caption of the attorney-drafted narrative includes the phrase "Race/Color Discrimination" with no allegations of race-based disparate treatment in the body. Even liberally construing the narrative, Ms. Peterkin's claims of race-based discrimination are not fairly within the scope of her religion and sex-based claims. This makes her charge different from the cases she cites in support of her argument. For example, in *Anjelino v. New York Times*, our Court of Appeals held the employees' hostile work environment claims were fairly within the scope of the EEOC charge where they referred to the term "abusive atmosphere" rather than "hostile work environment."[106] The court found the terms "abusive atmosphere" and "hostile work environment" interchangeable making the sexual harassment charge fairly within the scope of the EEOC charge, and rejected the employer's argument the employees failed to exhaust administrative remedies.[107]

Ms. Peterkin cites *Mroczek v. Bethlehem Steel Corp.* to support her argument her race-based claims are fairly within the scope of her religion and sex-based EEOC charge.[108]   In *Mroczek*, the plaintiff filed an EEOC charge checking the "retaliation" box only and not the box for sex-based discrimination. Plaintiff brought a retaliation and sexual harassment claim and defendant argued plaintiff failed to exhaust the sexual harassment claim. The district court disagreed, finding the narrative section of the charge form provided sufficient detail of sexual harassment and sexually explicit comments, as well as retaliatory acts for reporting the conduct,

to be within the scope of the EEOC charge despite failing to have checked the box for sex-based discrimination.[109]

Unlike the plaintiffs in *Anjelino* and *Mroczek*, Ms. Peterkin's nineteen-page narrative attached to the EEOC charge form does not indicate she alleged a racially motivated termination; the entire narrative surrounds alleged conduct relating to her religious garments. We will not leap to find the wearing of religious garments is so tied to Ms. Peterkin's race so as to equate to race discrimination. We conclude Ms. Peterkin's race-based claims are not fairly within the scope of her EEOC charge and we dismiss her race-based Title VII claims.

**2.    Ms. Peterkin fails to state a claim for religion-based discrimination under Title VII, race-based discrimination under section 1981, and abandoned her sex-based discrimination claims under the PHRA and PFPO.**

Ms. Peterkin brings discrimination claims based on religion and race under Title VII; race-based discrimination under section 1981; and sex-based discrimination under the PHRA and PFPO. The Prospect Defendants, American Airlines, and Piedmont Airlines each move to dismiss these claims arguing Ms. Peterkin fails to state a prima facie claim for discrimination based on race, religion, or sex.

To state a claim for discrimination under Title VII, section 1981, the PHRA, and PFPO, Ms. Peterkin must allege: (1) she is a member of a protected class; (2) she is qualified for the job; (3) she suffered an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination.[110]

### *Ms. Peterkin fails to allege race-based discrimination.*

Although we dismiss Ms. Peterkin's race-based claims under Title VII, she claims alleges race-based discrimination, hostile work environment, and retaliation under section 1981 which, as noted above, do not require administrative exhaustion. The Prospect Defendants, American

Airlines, and Piedmont Airlines argue Ms. Peterkin's complaint lacks any facts to support race-based discrimination under section 1981.[111]

Ms. Peterkin argues she pleaded sufficient facts to support a claim for race-based discrimination. She contends her Muslim religion is closely tied to her Afro-Latina race and, after the September 11, 2001 attacks on the United States, we may infer comments regarding Muslim terrorists and terrorism demonstrate race-based animus because of the "intersectionality" of race and religion. Ms. Peterkin provides no authority for this proposition. And it does not appear to be factually correct. According to the Pew Research Center, "[n]o racial or ethnic group makes up a majority of Muslim American adults. A plurality (41%) are white, a category that includes those who describe their race as Arab, Middle Eastern, Persian/Iranian or in a variety of other ways … About three-in-ten are Asian (28%), including those from South Asia, and one-fifth are black (20%). Fewer are Hispanic (8%), and an additional 3% identify with another race or with multiple races."[112]

Her amended Complaint is bereft of a fact supporting discrimination based on race. Ms. Peterkin alleges only she is an Afro-Latina Muslim American woman. There are no other allegations regarding race. Her allegations instead focus on her religion and religious garments. Ms. Peterkin fails to plausibly state claims for race-based discrimination under section 1981.

### Ms. Peterkin fails to state a claim for religion-based discrimination.

The Prospect Defendants, American Airlines, and Piedmont Airlines argue Ms. Peterkin fails to allege facts to support the third and fourth prongs of the prima facie case of discrimination. Defendants argue there is no adverse employment action and no adverse action occurred under circumstances giving rise to an inference of discrimination.

Ms. Peterkin's identifies three adverse employment actions: (1) an unidentified person prohibited her from pushing wheelchairs for Piedmont and American Airlines passengers for two weeks depriving her of the potential to earn tips;[113] (2) the assignment from a domestic terminal to the Airport's international terminal by Prospect General Manager Robles subjected her to a disparaging comment by a passenger;[114] and (3) directing her to clock out of her shift at a different gate which inconvenienced her.[115]

An adverse employment action is defined by our Court of Appeals "as an action by an employer that is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges or employment."[116] The action must create "a *significant* change in employment status, such as hiring, firing, failing to promote, reassignment with *significantly* different responsibilities, or a decision causing a significant change in benefits."[117]

Ms. Peterkin does not plead a significant change in her employment status with regard to her assignment in the Airport's international terminal and the direction to change her clock out location. She does not allege economic loss or change to the compensation, terms, conditions, or privileges of her employment.[118] She does not allege whether her assignment in the international terminal or the direction to clock out at a different location was temporary or permanent and whether these changes affected her pay or other benefit or condition of employment. She alleges Prospect Services hired her as a personal service attendant to assist passengers at the Airport, but does not explain how working in different terminals in the Airport significantly changed her employment.

While the allegation a two-week prohibition on pushing a wheelchair depriving her of the potential to earn tips may possibly be an adverse employment action, Ms. Peterkin does not plead facts allowing us to plausibly infer the alleged loss of tips created a significant change in her

employment status with regard to her compensation. We do not know Ms. Peterkin's hourly wage, how often she pushed wheelchairs instead of the variety of other duties she identifies, and, on the days she pushed wheelchairs, how much she typically earned in tips as opposed to days when she did not push wheelchairs.

Ms. Peterkin fails to plausibly allege facts sufficient to allege the two-week restriction from pushing wheelchairs creates a significant change in her employment status. There is insufficient factual content to draw a reasonable inference of an adverse employment action. We dismiss Ms. Peterkin's religion and race-based discrimination under Title VII and section 1981.

The fourth prong requires the adverse employment action occurred under circumstances giving rise to an inference of discrimination. Even if Ms. Peterkin sufficiently pleaded an adverse employment action, she must still allege facts giving rise to a plausible inference of discrimination based on her religion.

The Prospect Defendants, American Airlines, and Piedmont Airlines argue Ms. Peterkin fails to include facts to plausibly give rise to an inference of discrimination based on her religion. They argue Ms. Peterkin fails to allege comparators who reported to the same supervisor, were subjected to the same standards, and engaged in similar conduct who were treated more favorably. The Prospect Defendants argue Ms. Peterkin generally alleges non-Muslims were treated differently than her but this is a bare allegation with no facts. Ms. Peterkin generally alleges the Defendants did not subject non-Muslims to the same treatment, but she does not plead facts to support this assertion.

A plaintiff may show disparate treatment by alleging "similarly situated" employees, or comparators, not within a plaintiff's protected class are treated more favorably.[119] "Similarly situated" does not mean identically situated, but Ms. Peterkin and her comparators must be

similarly situated "in all relevant respects."[120] Relevant factors to establish comparators include a "'showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish the conduct or their employer's treatment of them.'"[121]

With respect to the alleged adverse employment actions, Ms. Peterkin alleges "[u]pon information and belief, other non-Muslim employees of Defendants who were victims of similar discriminatory and/or violent behavior were not required to alter their work routines, including but not limited to where they clock out."[122] There are no allegations the "other non-Muslim employees" dealt with the same supervisor or were subject to the same standards. And she fails to allege comparators regarding wheelchair pushing or assignment to the international terminal. Ms. Peterkin's religious discrimination claim fails to plausibly plead an inference of intentional discrimination.

### *Ms. Peterkin abandoned her sex-based discrimination claims.*

Ms. Peterkin averred sex-based discrimination in violation of the PHRA and PFPO. In response to the motions to dismiss, Ms. Peterkin admits her PHRA and PFPO claims are incorrectly pleaded as sex-based discrimination which she meant to plead as race and religion-based discrimination claims.[123] Ms. Peterkin seeks leave through her response brief to amend her complaint. Ms. Peterkin may not amend her pleading through her brief in opposition to the Defendants' motions to dismiss.[124] In any event, Ms. Peterkin abandoned her sex-based claims of discrimination under the PHRA and PFPO and we dismiss them including her sex-based claims of retaliation and aiding and abetting an unlawful discriminatory practice.[125]

D.     **Ms. Peterkin fails to plead hostile work environment claims based on race and religion under Title VII and section 1981.**

Ms. Peterkin brings hostile work environment claims based on race and religion against the Prospect Defendants, Piedmont Airlines, and American Airlines under Title VII and section 1981. To plead a hostile work environment claim under Title VII, Ms. Peterkin must allege: (1) she suffered intentional discrimination; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected her; (4) it would have detrimentally affected a reasonable person in like circumstances; and (5) a basis for employer liability is present.[126] The elements of a hostile work environment under section 1981 are the same as Title VII except the first element requires intentional discrimination because of race.[127]

The Prospect Defendants move to dismiss the hostile work environment claims arguing Ms. Peterkin fails to allege facts sufficient to meet the second, fourth, and fifth elements. The Prospect Defendants argue the two isolated passenger comments occurred more than six months apart and the incidents with Mr. Howlett are not severe or pervasive. With respect to Mr. Howlett's conduct, the Prospect Defendants argue Ms. Peterkin does not allege Mr. Howlett acted with discriminatory intent.

Piedmont Airlines and American Airlines argue Ms. Peterkin fails to allege facts sufficient to meet the first and second elements. They argue there are no allegations of comment or conduct by their employees, including Mr. Howlett, show a racial or religion-based discriminatory animus. They argue there is no severe or pervasive harassment.

In response, Ms. Peterkin identifies three incidents creating a hostile work environment based on race and religion: (1) the Prospect Defendants, Piedmont Airlines, and American Airlines failed to address the comments made by two passengers; (2) the Defendants failed to address

American Airlines employee Mr. Howlett's conduct; and (3) her assignment at the international termination to increase the likelihood of anti-Muslim comments.

### *Failure to address comments made by two passengers.*

Ms. Peterkin alleges two passengers made comments to her related to her religious garments: (1) in February/March 2019, a passenger said, "You can't help me you Muslim terrorist b****! You might have a bomb under that s***"; and, (2) on September 30, 2019, a passenger said, "I can't believe they have a f***ing terrorist working at the airport."

Ms. Peterkin alleges she reported the February/March 2019 passenger comment to Prospect Services's Terminal Supervisor Robinson.[128] She alleges neither Prospect Services's Supervisor Robinson nor an employee of Piedmont or American Airlines prepared an incident report, requested her to prepare an incident report, investigate the situation, or speak to the customer.[129] Ms. Peterkin alleges she reported the second comment to Prospect Services's employee Ms. Rodgers and non-party Frank Bonilla (employer unknown) who never wrote a report, investigated the incident, or took remedial action.[130]

The Prospect Defendants argue the passengers' alleged comments are not severe or pervasive because separate passengers made the comments more than six months apart. Piedmont Airlines and American Airlines do not address the passengers' comments.

Conduct is severe or pervasive "when the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"[131] Our Court of Appeals instructs there is a difference between "severe" or "pervasive" harassment; they are "alternative possibilities."[132] "[S]ome harassment may be severe enough to contaminate an environment even if not pervasive; other, less objectionable, conduct will contaminate the workplace only if it is

pervasive."[133] To determine whether an environment is hostile, we must consider "the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"[134]

We cannot find two passenger comments in six months at the Airport is pervasive. The comments may be sufficiently severe as to Ms. Peterkin's religion only.[135] At the motion to dismiss stage, and noting our Court of Appeals' liberal treatment of "severe" or "pervasive," we find Ms. Peterkin sufficiently alleges severe conduct.[136] But Ms. Peterkin's pleading is deficient because she fails to allege facts to support a basis for employer liability. Unlike most hostile work environment cases, Ms. Peterkin complains about the comments of passengers, not co-workers or supervisors. Employers are not automatically liable for a hostile environment.[137] Where a hostile work environment is created by non-supervisory co-workers, the employer is liable if it knew or should have known about the conduct and failed to either provide a reasonable avenue for complaint or to take prompt and appropriate remedial action.[138]

Ms. Peterkin pleads two comments allegedly made by passengers regarding her religion and references to terrorism and terrorists. An employer may be liable under Title VII for the conduct of third parties if the employer knew about the conduct and failed to take reasonable remedial action in response.[139] The February/March 2019 comment could not have been known to the Prospect Defendants, Piedmont Airlines or American Airlines until after Ms. Peterkin reported it. Ms. Peterkin alleges she reported the comment to Prospect Services's Terminal Supervisor Robinson who she claims did not prepare an incident report or otherwise address her complaint. Six months later, a passenger made another comment. Ms. Peterkin does not allege she reported this comment to a supervisor; she alleges only she reported the comment to Ms. Rodgers and non-

party Frank Bonilla. There are no allegations as to Ms. Rodgers' or Mr. Bonilla's positions or for whom they work. Ms. Peterkin does not allege how the Prospect Defendants, Piedmont Airlines, or American Airlines could take remedial action for passenger conduct in a different terminal in the Airport. Ms. Peterkin does not plausibly allege a basis for employer liability.[140] We dismiss her hostile work environment claim based on the passenger comments.

### Mr. Howlett's July 5 and 6, 2019 conduct.

Ms. Peterkin next alleges Mr. Howlett's conduct in demanding to see her badge and uncovering her face and Defendants' failure to address it constitutes a hostile work environment based on religion and race. Mr. Howlett is an American Airlines employee. Ms. Peterkin does not allege Mr. Howlett is her supervisor.

We do not find Mr. Howlett's pleaded conduct could constitute severe or pervasive discrimination. Mr. Howlett demanded to see Ms. Peterkin's badge and her face when he could not identify her from her badge. She complains Mr. Howlett did not follow protocol allowing her to verify her identity by showing her face to a female manager in a secluded area. But we do not see this request as severe or pervasive race or religion-based discrimination. Ms. Peterkin concedes she is required to verify her identity through a protocol. Ms. Peterkin objects to Mr. Howlett's manner in addressing the identification issue, but Title VII is not "a general civility code" for the workplace.[141]

Ms. Peterkin fails to allege a basis for the Prospect Defendants' liability for Mr. Howlett's conduct. By her own pleading, American Airlines employed Mr. Howlett. Ms. Peterkin may believe American Airlines and Piedmont Airlines are in a joint employment relationship with Prospect, but there are no allegations Prospect Services is a joint employer of Mr. Howlett.

29

American Airlines and Piedmont Airlines do not address Ms. Peterkin's allegation they failed to address Mr. Howlett's behavior creating a hostile work environment. They instead argue Ms. Peterkin offers no allegations Mr. Howlett's conduct is based on her race or religion, the first element of the prima facie case, and Mr. Howlett's conduct is neither severe nor pervasive. As explained above, we agree Ms. Peterkin pleads no facts to establish these elements. We dismiss Ms. Peterkin's hostile work environment claim based on Mr. Howlett's conduct.

### *The indeterminate assignment to the international terminal.*

Ms. Peterkin next cites Prospect Services's General Manager Robles assigning her to the Airport's international terminal from the domestic terminal nearly three months after the incident with Mr. Howlett. Ms. Peterkin alleges Defendants assigned her to the international terminal "where she was in full view of all patrons of the airport" to "increase the likelihood" she would be discriminated against because of her race and religion.

This allegation absent facts fails to support a hostile work environment claim. Ms. Peterkin does not allege an assignment to the international terminal because of her race and religion. She does not explain how, if she worked with passengers in the Airport's domestic terminal, her work in the international terminal created more exposure to passengers. She does not explain how, if a passenger had already made a comment in the domestic terminal, moving her away from that terminal to the international terminal somehow increased the likelihood of discrimination based on either her race or religion. She does not allege how a work reassignment is severe or pervasive discrimination based on race or religion. She does not allege how her assignment to the international terminal is intentional discrimination. We dismiss Ms. Peterkin's hostile work environment claim based on the transfer to the international terminal.

E.     **Ms. Peterkin fails to state a claim for retaliation under Title VII and section 1981.**

Ms. Peterkin alleges Defendants retaliated against her based on her race in violation of Title VII and section 1981. Ms. Peterkin must successfully state an underlying section 1981 claim of discrimination based on race to state a retaliation claim under section 1981. As analyzed above, Ms. Peterkin failed to plead sufficient facts to state race-based discrimination under section 1981. We must dismiss her retaliation claim based on this theory.[142]

We turn to Ms. Peterkin's Title VII retaliation claim. To state such a claim, Ms. Peterkin must allege: "(1) she engaged in protected activity which can include informal protests of discriminatory employment practices such as making complaints to management; (2) 'adverse action by the employer either after or contemporaneous with [her] protected activity'; and (3) a causal connection between the protected activity and the adverse action."[143] Where temporal proximity between the protected activity and adverse action is "unusually suggestive," causation may be inferred.[144] Where the temporal proximity, generally days and not weeks or months, is not unusually suggestive, we consider the time plus additional evidence to establish causation.[145]

The Prospect Defendants, Piedmont and American Airlines argue Ms. Peterkin fails to allege an adverse employment action and a causal connection. Ms. Peterkin responds she complained about discriminatory conduct and suffered adverse employment actions in the two-week restriction on pushing wheelchairs, her transfer to the international terminal, and the inconvenience of having to clock out at another gate to avoid Mr. Howlett.

We already found Ms. Peterkin failed to sufficiently allege an adverse employment action. We must dismiss her retaliation claim. Even if she adequately pleaded an adverse employment action, she fails to plead a causal connection. Ms. Peterkin alleges in February/March 2019, she reported the first passenger complaint to Prospect Services's Terminal Supervisor Robinson. Two

to three months later, in May 2019, Ms. Peterkin alleges someone prohibited her from pushing wheelchairs for two weeks. A two to three-month time period is not usually suggestive and Ms. Peterkin fails to allege additional facts to suggest a causal connection.

Ms. Peterkin alleges in July 2019 after the incident with Mr. Howlett, American Airlines Manager Cortez directed her to clock out at another gate to avoid Mr. Howlett after complaining about his conduct. On September 27, 2019, someone transferred Ms. Peterkin to the international terminal. There is no protected conduct identified with relation to this alleged adverse employment action. Having failed to allege and adverse employment action or facts to support a causal connection even if she sufficiently pleaded an adverse action, we dismiss Ms. Peterkin's retaliation claim.

### F.    The Pennsylvania Human Relations Act bars the Philadelphia ordinance claim.

There is an additional basis to dismiss Ms. Peterkin's PFPO claims. The Philadelphia Commission on Human Relations enforces the PFPO.[146] The PFPO provides: "The Commission shall not accept a complaint from any person who has filed a complaint with the Pennsylvania Human Relations Commission with respect to the same grievance."[147] The PFPO also requires Ms. Peterkin to obtain notice from the Commission before filing an action in the Court of Common Pleas of Philadelphia County.[148]

Ms. Peterkin dual-filed her charge of discrimination with the EEOC and the PHRC. It appears she also filed it with the Philadelphia Commission on Human Relations.[149] She does not allege receiving a notice from the PFPO. Her PFPO claims are barred by the filing of her PHRC charge and she failed to obtain notice from the Commission.[150]

III.    **Conclusion**

We dismiss Ms. Peterkin's race-based claims under Title VII as unexhausted; her race-based discrimination claims under 42 U.S.C. § 1981 and her religion-based discrimination under Title VII for failure to state a claim; her hostile work environment claims based on race and religion under Title VII and section 1981; her claim against the City under 42 U.S.C. § 1983 for failing to allege an employment relationship with the City; her sex-based discrimination and retaliation claims under the PHRA and PFPO and aiding and abetting claims as abandoned; and, her PFPO claims as barred by her filing a charge with the PFPO.

---

[1] ECF Doc. No. 13 ¶ ¶ 35, 85.

[2] *Id.* ¶¶ 11–18, 35. Ms. Peterkin has yet to serve Dontae Robinson.

[3] *Id.* ¶ 37.

[4] *Id.* ¶¶ 38–40.

[5] *Id.* ¶ 43.

[6] *Id.* ¶ 2.

[7] *Id.* ¶ 51.

[8] *Id.* ¶¶ 6, 47, 48.

[9] *Id.* ¶¶ 47, 48, 50. Ms. Peterkin alleges the City retained exclusive control over the clearance requirements for work at the Airport. *Id.* ¶ 47.

[10] *Id.* ¶¶ 49-50, 52.

[11] *Id.* ¶ 55.

[12] *Id.* ¶ 64.

[13] *Id.* ¶¶ 65, 68.

[14] *Id.* ¶ 69.

[15] *Id.* ¶¶ 69, 70.

[16] *Id.* ¶¶ 73–75.

[17] *Id.* ¶ 77.

[18] *Id.* ¶¶ 77, 78.

[19] *Id.* ¶ 82.

[20] *Id.* ¶ 84.

[21] *Id.* ¶¶ 86, 93, 94.

[22] *Id.* ¶¶ 101, 102.

[23] *Id.* ¶ 103.

[24] *Id.* ¶¶ 104-06.

[25] *Id.* ¶ 107.

[26] Mr. Howlett remains unserved.

[27] ECF Doc. No. 13 ¶¶ 114-116, 120.

[28] *Id.* ¶¶ 118-123.

[29] *Id.* ¶¶ 134-37. Mr. Cortez remains unserved.

[30] *Id.* ¶¶ 152-56. Mr. Mansfield remains unserved.

[31] *Id.* ¶¶ 158-60.

[32] *Id.* ¶¶ 163-64.

[33] *Id.* ¶¶ 165-67.

[34] *Id.* ¶¶ 170-71.

[35] *Id.* ¶ 175. Ms. Peterkin does not plead Ms. Rodgers' position at Prospect Services.

[36] *Id.* ¶¶ 175-78.

[37] *Id.* ¶¶ 180-82.

[38] *Id.* ¶¶ 183-86.

---

[39] *Id.* ¶ 187.

[40] *Id.* ¶ 190.

[41] *Id.* ¶¶ 24, 25. Ms. Peterkin alleges she filed her EEOC charge on September 24, 2019. But the EEOC charge is dated July 12, 2019 and her attorney's narrative attached to the charge is dated September 24, 2019. *See* ECF Doc. No. 34-2 at 2–22. In addition to filing her charge with the PHRC, Ms. Peterkin also filed with the Philadelphia Commission on Human Relations. *Id.* at 3.

[42] ECF Doc. No. 34-2 at 2.

[43] *Id.* at 4.

[44] ECF Doc. No. 13 ¶ 27.

[45] *Id.* ¶¶ 195, 197, 205-06.

[46] As pleaded, Ms. Peterkin's federal claims appear to be barred by the statute of limitations. After receiving the September 10, 2020 right-to-sue letter from the EEOC, Ms. Peterkin had ninety days—until December 9, 2020—to file a civil action on her federal employment discrimination claims. 42 U.S.C. § 2000e–5(f)(1). Ms. Peterkin did not file her action here until February 2, 2021.

[47] ECF Doc. No. 34-4.

[48] Ms. Peterkin's Amended Complaint erroneously contains two claims identified as the "Eleventh Cause of Action."

[49] 42 U.S.C. § 42 U.S.C. § 2000e, *et seq*.

[50] 43 P.S. § 955 *et seq*.

[51] Phila. Code, § 9-1100.

[52] *See* ECF Doc. Nos. 27, 30, 31, and 34. Ms. Peterkin has not served individual defendant employees of Prospect Services, Dontae Robinson and Jawan Mansfield, and American Airline employees Martin Howlett and Mr. Cortez.

[53] *Constitution Party of Pa. v. Aichele*, 757 F.3d 347, 358 (3d Cir. 2014).

[54] *Id.*; *Davis v. Wells Fargo*, 824 F.3d 333, 346 (3d Cir. 2016).

[55] *Davis*, 824 F.3d at 346.

[56] *Id.* (quoting *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)).

[57] ECF Doc. No. 34-1 at 6–10.

---

[58] 49 U.S.C. § 44901, *et seq.*

[59] 29 C.F.R. §§ 1540–1562.

[60] *Pellegrino v. United States of Am. Transp. Sec. Admin., Div. of Dep't of Homeland Sec.*, 937 F.3d 164, 168 (3d Cir. 2019).

[61] 49 U.S.C. § 44903(b).

[62] *Id.* § 44903(g), (h).

[63] 49 C.F.R. §§ 1542.201, 1541.211(a), (d).

[64] 49 C.F.R. § 1542.211(a).

[65] *Vanderklok v. United States*, 868 F.3d 189, 194-95 (3d Cir. 2017).

[66] *Bivens v. Six Unknown Federal Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971). In *Bivens*, the Supreme Court recognized a remedy for a federal agent's violation of a citizen's constitutional right.

[67] *Vanderklok*, 868 F.3d at 195.

[68] *Id.* at 206.

[69] *Id.* at 208.

[70] *Id.* (citing 49 U.S.C. § 46110(c)).

[71] *Id.*

[72] *Id.* at 208–09.

[73] *See Orleski v. Pearson*, 337 F. Supp. 2d 695, 697, n.1  (W.D. Pa. 2007) (terminated TSA security screener alleging state tort and contract claims against an independent contractor of the TSA are preempted); *Teamer v. Napolitano*, No. 11-1808, 2012 WL 1551309, *1 n. 2 (S.D. Tex. May 1, 2012) (terminated TSA security screener's claims under the Rehabilitation Act are preempted); *Pickrell v. Firstline Transp. Sec., Inc.*, No. 11-6011, 2011 U.S. Dist. LEXIS 162842 (W.D. Mo. Apr. 28, 2011) (state law disability discrimination and retaliation claims brought by terminated security screener against TSA independent contractor preempted); *Conyers v. Rossides*, 558 F.3d 137 (2nd Cir. 2009) (plaintiff's challenge to TSA's failure to hire him is not reviewable under the Administrative Procedures Act but rather under the Aviation and Transportation Security Act).

[74] ECF Doc. No. 13 ¶¶ 110–114, 127, 145–149.

[75] *Id.* ¶¶ 51, 124.

[76] *See Joren v. Napolitano*, 633 F.3d 1144, 1146 (7th Cir. 2011) (citing *Castro v. Sec'y of Homeland Sec.*, 472 F.3d 1334, 1337 (11th Cir. 2006); *Conyers v. Merit Sys. Prot. Bd.*, 388 F.3d 1380, 1383 (Fed. Cir. 2004); *Rossides*, 558 F.3d at 144).

[77] 49 U.S.C. § 44935(f).

[78] *Galaza v. Wolf*, 954 F.3d 1267 (9th Cir. 2020).

[79] *Id.* at 1268–69.

[80] *Id.* at 1271–72.

[81] *Teamer*, 2012 WL 1551309 at *9–*10.

[82] Federal Rule of Civil Procedure 12(b)(6) requires a complaint to state a claim upon which relief can be granted. Fed. R. Civ. P. (12)(b)(6). The purpose of Rule 12(b)(6) is to test the sufficiency of the factual allegations in a complaint. *Sanders v. United States*, 790 F. App'x 424, 426 (3d Cir. 2019). If a plaintiff is unable to plead "enough facts to state a claim to relief that is plausible on its face," the court should dismiss the complaint. *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Kajla v. U.S. Bank Nat'l Ass'n as Tr. for Credit Suisse First Boston MBS ARMT 2005-8*, 806 F. App'x 101, 104,  n. 5 (3d Cir. 2020) (quoting *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 84 (3d Cir. 2011)). "A claim has facial plausibility when the plaintiff pleads factual content … allow[ing] the court to draw the reasonable inference … the defendant is liable for the misconduct alleged." *Robert W. Mauthe M.D., P.C. v. Spreemo, Inc.*, 806 F. App'x 151, 152 (3d Cir. 2020) (quoting *Zuber v. Boscov's*, 871 F.3d 255, 258 (3d Cir. 2017)). While "[t]he plausibility standard is not akin to a 'probability requirement,'" it does require the pleading show "more than a sheer possibility … a defendant has acted unlawfully." *Riboldi v. Warren Cnty. Dep't of Human Servs. Div. of Temp. Assistance & Soc. Servs.*, 781 F. App'x 44, 46 (3d Cir. 2019) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A pleading that merely 'tenders naked assertion[s] devoid of further factual enhancement' is insufficient." *Id.* (quoting *Iqbal*, 556 U.S. at 668).

In determining whether to grant a 12(b)(6) motion, "we accept all well-pleaded allegations as true and draw all reasonable inferences in favor of the plaintiff" but "disregard threadbare recitals of the elements of a cause of action, legal conclusions, and conclusory statements." *Robert W. Mauthe, M.D., P.C.,* 806 F. App'x at 152 (quoting *City of Cambridge Ret. Sys. v. Altisource Asset Mgmt. Corp.*, 908 F.3d 872, 878-79 (3d Cir. 2018)). Our Court of Appeals requires us to apply a three-step analysis to a 12(b)(6) motion: (1) we "'tak[e] note of the elements a plaintiff must plead to state a claim'"; (2) we "identify allegations that … 'are not entitled to the assumption of truth' because those allegations 'are no more than conclusion[s]'"; and, (3) "'[w]hen there are well-pleaded factual allegations,' we 'assume their veracity' … in addition to assuming the veracity of 'all reasonable inferences that can be drawn from' those allegations, …, and, construing the allegations and reasonable inferences 'in the light most favorable to the [plaintiff]'…, we determine whether they 'plausibly give rise to an entitlement to relief.'" *Oakwood Laboratories LLC v. Thanoo*, --F.3d -- , No. 19-3707, 2021 WL 2325127, at *7 (3d Cir. June 8, 2021) (internal citations omitted); *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016).

[83] *Faush v. Tuesday Morning, Inc*., 808 F.3d 208, 215 (3d Cir. 2015); *Anderson v. Finley Catering Co., Inc*., 218 F.Supp.3d 417, 421 (E.D.Pa. 2016).

[84] *Brown v. J. Kaz, Inc*., 581 F.3d 175, 179, n. 1 (3d Cir. 2009).

[85] *Plaso v. IJKG, LLC*, 553 F. App'x 199, 204 (3d Cir. 2014); *Covington v. Int'l Ass'n of Approved Basketball Officials*, 710 F.3d 114, 119 (3d Cir. 2013).

[86] *Faush*, 808 F.3d at 214 (quoting *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 324 (1992)). We are directed by our Court of Appeals to consider a non-exhaustive list of relevant factors, including (1) the skill required; (2) the source of the instrumentalities and tools; (3) the location of the work; (4) the duration of the relationship between the parties; (5) whether the hiring party has the right to assign additional projects to the hired party; (6) the extent of the hired party's discretion over when and how long to work; (7) the method of payment; (8) the hired party's role in hiring and paying assistants; (9) whether the work is part of the regular business of the hiring party; (10) whether the hiring party is in business; (11) the provision of employee benefits; and (12) the tax treatment of the hired party. *Id.* (quoting *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323–24 (1992)). These are known as the "*Darden*" factors.

[87] ECF Doc. No. 13 ¶¶ 10, 37, 38, 47–49.

[88] *Id.* ¶¶ 35, 36.

[89] *Id.* ¶¶ 37–39, 43–45, 58.

[90] *Id.* ¶¶ 69, 73, 77,  100.

[91] 42 U.S.C. § 2000e-2(a); 43 Pa. Stat. § 955(a); Phila. Code, Title 9, Chapter § 9-1103(1). These laws prohibit discrimination on the basis of other protected characteristics, but only race, religion, and sex are relevant here.

[92] *St. Francis College v. Al-Khazraji*, 481 U.S. 604, 609 (1987).

[93] *See Castleberry v. STI Group*, 863 F.3d 259, 263 (3d Cir. 2017) (Title VII and section 1981 claims analyzed under the same standard); *Goosby v. Johnson & Johnson Medical, Inc.*, 228 F.3d 313, 317 n. 3 (3d Cir. 2000) (Title VII and the PHRA are analyzed under the same standards); *Joseph v. Continental Airlines, Inc.*, 126 F. Supp. 2d 373, 376, n.3 (E.D. Pa. 2000) (Title VII, section 1981, and Philadelphia Fair Practices Ordinance analyzed under the same standard).

[94] *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 163 (3d Cir. 2013).

[95] *Id.* (citing *Atkinson v. Lafayette Coll.*, 460 F.3d 447, 454 n. 6 (3d Cir. 2006)).

[96] The Pennsylvania Supreme Court has not decided whether the PFPO requires exhaustion of administrative remedies before bringing claims. Courts within our district and the Pennsylvania Commonwealth Court require exhaustion under the PFPO. *See Vazquez v. Carr and Duff, Inc.*,

No. 16-1727, 2017 WL 4310253, at * 8 (E.D. Pa. Sept. 28, 2017) (citing *Ives v. NHS Human Servs.*, No. 15-5317, 2016 WL 4039644, at *3 (E.D. Pa. July 27, 2016) ); *Ahern  v. Eresearch Tech., Inc.*, 183 F.Supp.3d 663, 668 (E.D. Pa. 2016) (citing *Richards v. Foulke Assocs., Inc*., 151 F. Supp. 2d 610, 616 (E.D. Pa. 2001) ); *Marriott Corp. v. Alexander*, 799 A.2d 205, 208 (Pa. Commw. Ct. 2002) (adopting *Richards*).

[97] *Woodson v. Scott Paper Co.*, 109 F.3d 913, 926 (3d Cir. 1997).

[98] *Mandel*, 706 F.3d at 163 (quoting *Ostapowicz v. Johnson Bronze Co*., 541 F.2d 394, 398–99 (3d Cir. 1976)).

[99] *Cheyney State Coll. Faculty v. Hufstedler*, 703 F.2d 732, 737 (3d Cir. 1983).

[100] ECF Doc. No. 34-2.

[101] *Antol v. Perry*, 82 F.3d 1291, 1296 (3d Cir. 1996).

[102] *Simko v. United States Steel Corp.*, 992 F.3d 198, 206–07 (3d Cir. 2021); *Barzanty v. Verizon PA, Inc*., 361 F. App'x 411, 414 (3d Cir. 2010) (citing 42 U.S.C. §§ 2000e-5(b), (e)(1)).

[103] *Barzanty*, 361 F. App'x at 414 (citing *Hicks v. ABT Assoc., Inc.*, 572 F.2d 960, 966 (3d Cir. 1978)).

[104] *Id.*

[105] *Mandel*, 706 F.3d at 163 (quoting *Antol*, 82 F.3d at 1295).

[106] 200 F.3d 73, 93 (3d Cir. 1999).

[107] *Id.* at 94-95.

[108] 126 F. Supp. 2d 379 (E.D. Pa. 2001). Ms. Peterkin's response brief refers to a case identified only as "*Weems*."  She did not offer the full name of the case or its citation.

[109] *Id.* at 385.

[110] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

[111] We would conclude she failed to state a claim even if Ms. Peterkin administratively exhausted her Title VII race-based claim.

[112]     https://www.pewforum.org/2017/07/26/demographic-portrait-of-muslim-americans/#fn-28360-9 (last visited June 4, 2021).

[113] ECF Doc. No. 13 ¶¶ 40, 84, 86, 93.

---

[114] *Id.* ¶¶ 180–186.

[115] *Id.* ¶¶ 166, 169–170.  In her response brief, Ms. Peterkin identifies these three adverse actions taken in retaliation for her alleged protected activity. *See* ECF Doc. No. 36 at 18. She identifies only two adverse actions—the two-week wheelchair prohibition and the assignment to the international termination—with regard to her claim for religion-based discrimination. *See* ECF Doc. No. 38 at 12, ECF Doc. No. 39 at 11-12.

[116] *Jones v. Se. Pa. Transp. Auth.*, 796 F.Supp.3d 323, 326 (3d Cir. 2015) (quoting *Storey v. Burns Int'l Sec. Servs.*, 390 F.3d 760, 764 (3d Cir. 2004)).

[117] *Oguejiofo v. Bank of Tokyo Mitsubishi UFJ Ltd*, 704 F. App'x 164, 168 (3d Cir. 2017) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998) (emphasis added)).

[118] *See e.g. McNeil v. Penn Warehousing and Distribution, Inc.*, No. 20-1775, 2021 WL 1923008, *4–*6 (E.D. Pa. May 13, 2021) (allegations of verbal and written discipline, calls to the employer's office in contemplation of issuing discipline, and unfavorable work assignments were insufficiently pleaded to plausibly support adverse employment actions).

[119] *Darby v. Temple Univ.*, 216 F.Supp.3d 535, 542 (E.D. Pa. 2016) (citing *Wilcher v. Postmaster Gen.*, 441 F. App'x 879, 881 (3d Cir. 2011)).

[120] *Blackshear v. Verizon, DE, LLC*, No. 11–1036, 2011 WL 5116912, at *2 (E.D. Pa. Oct. 27, 2011) (quoting *Opsatnik v. Norfolk S. Corp.*, 335 F. App'x 220, 222–23 (3d Cir. 2009)).

[121] *Id.* (quoting *McCullers v. Napolitano,* 427 F. App'x 190, 195 (3d Cir. 2011)).

[122] ECF Doc. No. 13 ¶ 171. Ms. Peterkin alleges generally in other instances not tied to the alleged adverse employment actions: "Upon information and belief, Defendant Piedmont managers always respond to a call for manager's assistance when the individual needing assistance is non-Muslim"; "Upon information and belief, non-Muslim individuals who requested religious accommodations were not required to fill out a Religious Accommodation form subsequent to their initial request when the accommodation(s) requested remained unchanged"; and "Upon information and belief, non-Muslim employees were not similarly treated." *Id.* ¶¶ 58, 78, 107.

[123] *See* ECF Doc. No. 36 at 11; Doc. No. 38 at 10; Doc. No. 39 at 10.

[124] *Frederico v. Home Depot*, 507 F.3d 188, 201–02 (3d Cir. 2007) (citations omitted). Ms. Peterkin advises she will move to file a second amended complaint to correct the allegations under the PHRA and PFPO from sex-based discrimination to race and religion discrimination.

[125] *Smith v. RB Distribution, Inc.*, 498 F. Supp. 3d 645, 665 (E.D. Pa. 2020). In *Smith*, Judge McHugh dismissed PHRA aiding and abetting claims after finding no actionable discrimination under the PHRA.

[126] *Starnes v. Butler Cnty. Court of Common Pleas*, *50th Judicial District*, 971 F.3d 416, 428 (3d Cir. 2020) (quoting *Komis v. Sec'y of United States Dep't of Labor*, 918 F.3d 289, 293 (3d Cir. 2019)).

[127] *Castleberry*, 863 F.3d at 263; *Miller v. Thomas Jefferson Univ. Hosp.*, 908 F. Supp. 2d 639, 653 (E.D. Pa. 2012), *aff'd*, 565 F. App'x 88 (3d Cir. 2014).

[128] ECF Doc. No. 13 ¶ 64.

[129] *Id.* ¶¶ 65, 68.

[130] *Id.* ¶¶ 190, 192, 194.

[131] *Starnes*, 971 F.3d at 428 (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002)).

[132] *Castleberry*, 863 F.3d at 264.

[133] *Id.*

[134] *Mandel*, 706 F.3d at 168 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).

[135] The two comments relate to Ms. Peterkin's Muslim religion not her race.

[136] *Mahr v. Project Mgmt Inst. Inc.*, No. 20-3653, 2021 WL 322894, at *5 (E.D. Pa. Feb. 1, 2021) (citing *Dunn v. Bucks Cty. Cmty. College*, No. 13-6726, 2014 WL 2158398, at *2 (E.D. Pa May 21, 2014) (collecting cases)).

[137] *Huston v. Proctor & Gamble Paper Prods. Corp.*, 568 F.3d 100, 104–05 (3d Cir. 2009).

[138] *Id.*

[139] *Johnson v. Bally's Atlantic City*, 147 F. App'x 284, 286 (3d Cir. 2005) (citing *Lockard v. Pizza Hut, Inc.,* 162 F.3d 1062, 1073–74 (10th Cir. 1998)). The United States Court of Appeals for the Fourth and Fifth Circuits have held an employer may be liable for hostile work environments created by co-workers ***and*** third parties "if it knew or should have known about the harassment and failed to take effective action to stop it … [by] respond[ing] with remedial action reasonably calculated to end the harassment." *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 319 (4th Cir. 2008). "An employer is not subject to a lesser standard simply because an anonymous actor is responsible for the offensive conduct." *Pryor v. United Air Lines, Inc.*, 791 F.3d 488, 498 (5th Cir. 2015) (citing *EEOC v. Xerxes Corp.*, 639 F.3d 658, 672–73 (4th Cir. 2011)).

[140] *See Emery v. Uber Tech., Inc.*, No. 20-5156, 2021 WL 941978, at *6–*7 (D.N.J. Mar. 12, 2021).

[141] *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).

41

---

*Collins v. Kimberly-Clark Pennsylvania, LLC*, 247 F.Supp. 3d 571, 604–05 (E.D. Pa. 2017).

*Moore v. Secretary United States Dep't of Homeland Sec.,* 718 F. App'x 164, 166 (3d Cir. 2017) (quoting *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015)).

*LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007).

*Id.* at 233; *Blakney v. City of Phila.*, 559 F. App'x 183, 186 (3d Cir. 2014) (temporal proximity of two days unusually suggestive of causation but temporal proximity of greater than ten days requires supplementary evidence of retaliatory motive) (collecting cases).

Phila. Code § 9-1105.

Phila. Code § 9-1112(4).

Phila. Code § 9-1122(1).

ECF Doc. No. 34-2.

*Smith*, 498 F. Supp. 3d at 665.